Good morning, John Dallas. On behalf of Wee Chi or Jimmy Luong, I'm intending to save about 4 to 5 minutes for a rebuttal and I'll watch the clock. Maybe not, how much? 4 or 5. Oh, I thought you said 45. Thank you. I was also the trial attorney in this case. There's four main claims or groups of claims in the appeal. I'm intending to focus on two of them, the insufficiency of the evidence claim and the sentencing arguments. On the insufficiency of the evidence claim, our argument is that the evidence was insufficient for any rational juror to conclude beyond a reasonable doubt that the monies involved in the money laundering and spending claims were actual proceeds from either the Xenon or Centon robberies. We don't contest as a general matter that there was sufficient evidence to meet the sufficiency Jackson v. Virginia standard linking Mr. Luong to the robberies or the proceeds of the robberies. We also don't contest under the insufficiency standard that there was evidence that he actually participated in the financial transactions. But one of the elements the government must prove beyond a reasonable doubt is that the actual proceeds in the financial transactions came from the specified unlawful activities, in this case the Xenon or Centon robberies. And here it's lacking. Well, it doesn't seem like a very hard inference, though. I mean, the jury knows that your client came into a substantial amount of money as a result of the robberies. Why isn't that by itself enough for a reasonable juror to conclude that's where the money came from? Well, I think in some cases that may be possible, if someone robs a bank and takes $15,000 and the next day puts $15,000 or something close to that into a bank or something right around that date, you could – I think that inference is a fair inference from the record. In this case, it's not. There's about approximately $245,000 total in the financial transactions that took place between April and September 1995. The two robberies at issue were the Xenon robbery on April 20th, 1995, and the Centon robbery on May 16th, 1995. First, there was no witness or any evidence linking the money, the proceeds from those robberies, into any of the financial transactions. Most of the – What would they have to show? You know, if you've robbed a bank and a die marker has gone off in the bag and you try and spend the money that's been – that was soiled by the die marker, that's pretty conclusive. But when the government doesn't have that kind of proof, what does the government have to show? Well, it has to – I think that's a very factual-oriented inquiry. But they have to show something that – sufficient evidence for a juror to conclude beyond a reasonable doubt that the money came from those two robberies. Here you have substantial evidence that Mr. Wong was a member of a criminal organization called The Company, and it was four bosses that were involved in a number of robberies. And the jury heard that evidence. It's cited in our brief and in the prosecutor's brief. You have evidence, in particular, from Michael Winn, that he collected $120,000 from Jonathan Key in Miami, that he couldn't tell where that money came from, whether it came from the Centon robbery or other robberies or some debt, et cetera. You also have $30,000 that Mr. LeWong won from Harrah's Casino in gambling in May and June in 1995. Other than the one specific – two counts, 70 involving the Mercedes, 71 and 77, on April 25, 1995, all the other counts were at least – the financial transactions in those counts were two months or later after the Centon robbery, which was the later of the two robberies. So it's no – there's at least a two-month period between the second of the two robberies and the time any of the money was spent. With respect to the evidence of Mr. LeWong – Is the purchase of the Mercedes sufficient, which you've admitted is within the timeframe? No, I don't admit that, because for the same reasons where there's evidence that Mr. LeWong was a member involved in lots of robberies, I don't think the evidence is – there was no direct evidence even linking it to that. Okay. Let me just back up on the chronology. So we've got Zenon on April 20th and Centon on May 16th. When does he come into the money from those robberies? Well, some money came in shortly within a day or two after the robbery. Okay. That would be both robberies? Yes. So one in April and one in May. And when does he buy the Mercedes? April 25th, 1995. Okay. That's five days later. And he would – that's five days after the robbery, and he came in the money within a day or two. So pick your date. Let's say April 21st. That would be more generous to you. So within four days, he buys a Mercedes, and that's insufficient evidence to link the purchase of the Mercedes with the robbery? That the money came from that robbery rather than some other crime or some other robbery. Right. But this is a fact. Where do you think the money came from? Well, I mean, admittedly, there's no evidence. I mean, our only test is did a rational juror conclude that's where it came from? And, you know. But see, the question is not whether it came from criminal activity in general. It's whether it came from the specified unlawful activities. Sure. You got a big score four days before. I mean, you have proximity here. Let me just shift slightly, because it seems that the $5,000 check might be somewhat in contrast to some of the other circumstances. And I'd appreciate your analysis there, because there you potentially do have a case where you're just spending general ill-gotten gains. You know, he basically has a whole big scheme going, and I guess he dumps a bunch into his bank account. We know that. He didn't seem to have, you know, a job at Bank of America or anything where he was getting a normal salary. But what about the $5,000 check and the mortgage and the mother and the living at the house? Can you? Well, the $5,000 check, we had a separate argument that there wasn't evidence that he was of any intent to conceal. It was a check written from his own bank account. Right. And basically towards the mortgage of his parents' home. Did his parents live there? Yes, I believe so. No, I thought that was the – I thought he lived there. No, I think there was kind of maybe dispute about who lived there. But the – it was in his – it was in the parents' name. In our position, it was the parents' house, and that they lived there. The government is saying, I think, you know – Let me ask you this. Does it matter? I'm not sure. Does it matter? I have to say I'm not sure. I'm not sure it really does matter. That's the question. Does it matter who lived there? That's only really one count. But I think in general, there was insufficient evidence. I do want to – Well, let me just ask you. So you're not interested in us taking a look at just that one count? I am interested, but – I mean, would it make a difference in the sentence? Well, that's why I really want to focus on the main insufficiency of evidence in sentencing, because that's really the whole ballgame for me. The others may have some minor difference in the sentencing. It may have some – it's hard to say. It's hard to really know for sure, but I don't think it's going to have a dramatic difference. Fair enough. With respect to the sentencing arguments, we've argued that the evidence is insufficient – there's procedural error at sentencing as well as the sentence was substantially unreasonable. This case is very unusual on a lot of grounds, a lot of reasons. But there's three main reasons where I'm arguing that there were procedural error. I think the easiest and the most obvious procedural error is that the judge relied on clearly erroneous facts that were outside the record. In particular, the judge referred to the Zenon and Centon robberies as involving beatings and brutal treatment in some of the most vicious crimes he ever heard. That's not in the record. That's not in the trial. And the judge was wrong and was actually probably misreferring to a different crime, a different robbery that Mr. Wong had no connection to at all, and that's the Tai Chan home invasion robbery that did involve torture. It was very brutal. It was absolutely – it was implicated two of the other crime bosses in this organization, but not Jimmy Wong whatsoever. And as a result of relying on these clearly erroneous facts, the sentence should be reversed on that basis, and I believe it should be remanded to a different district judge. Why a different judge? Because I think this is pretty beyond the pale in terms of not just making kind of wrong statements about this case, but actually going, reaching out to another case, relying on facts in that case, and then making, referring, and using those facts against Mr. Wong in this case. But is that clear that he did that intentionally? Is that – you know, that seems to me to be a potential mistake on his part, but not necessarily a malicious one. I mean, he's had – there's a lot of accounts here, a lot of information. He's had this other case. It seems that you could easily say he simply mixed up – mixed the cases, which isn't necessarily willful on his part. That other case was a huge case where there was a specific motion to recuse Judge where – because he was the victim of a home invasion robbery himself. That's in the excerpts of the record. It involved – someone was killed in that home invasion robbery. It involved torture. It was very dramatic. I wasn't involved in that one, but I'm – it's very well known in the Eastern District. Because of the emotional nature of it, because of the inflammatory nature of it, and using it in this case, I don't think it was just a careless mistake. And I think that there's – in terms of deciding which judge you should go to, it's the appearance of whether one would expect the judge could remain fair and impartial at the next sentencing. Well, that starts to undermine your argument that there was a procedural error, that is, that the judge got confused and sentenced your client based on facts that didn't involve your client. You're suggesting he knew very well it wasn't your client and decided to sentence him this way anyway. Well, that's not a procedural error. No. The procedural error is relying on facts that he said that there were beatings in this case, brutal treatment, the most – some of the most vicious crimes you ever heard. There's no evidence in the record. Okay. So there's a mistake. But now you're saying there's not a mistake, because he knew that wasn't this case, and he sentenced your guy anyway. I mean, which way is it? I don't think they're mutually exclusive. There was an error, and it was an inflammatory error that was either intentional or even if it wasn't intentional, it raises the question of the partiality of the judge and what a – people that would expect in the next sentencing. What about substantive reasonableness? Substantive reasonableness, I also think that this is such a dramatic case where the guideline range was 63 to 78 months, and the judge went up to 480 months basically because he's sentenced on the basis of the robberies, not just the money laundering. I'm not aware of any case that has affirmed such a dramatic departure as in this case, and I think on that basis as well it should be reversed for – as an unreasonable sentence. Did anybody calculate what the guideline range would be if, in fact, the robbery were identified as the crime of conviction? No. I mean, because that's what's happening. And that's what's happening in both courts. I mean, the Northern District sentence seems disproportionate against the guideline range, except that obviously both judges were conscious of the robbery as being related to the crime of conviction. And that's what they were trying to focus on. So I certainly understand the disparity between the guideline range for the crime of conviction and the sentence imposed, but is it really so out of line if you look at the underlying conduct? Well, in the Northern District, I mean, he was sentenced for RICO convictions, conspiracy to commit RICO that involved the underlying robberies. So there were specific robberies as predicate acts. Were these robberies part of the predicate acts? I was under the impression they weren't, but maybe they were. Not charged as predicate acts. They were introduced at trial as evidence of the conspiracy to commit RICO. When you actually calculate the guidelines, when there's as many robberies as there were here, a number of them kind of fall out or don't particularly make a difference in terms of enhancing the sentence anymore. You get to a top guideline range and that's essentially it. The judge, I think, imposed a fair, reasonable sentence for Mr. Luong's participation in the robberies, which was a 25-year sentence. One of the other arguments that there's procedural error here and it may affect into the substantive unreasonableness is also the unusual dual nature of the sentencing is that Judge Shub essentially thought that he was going to add essentially 15 years on to the other sentence and that a 40-year sentence was appropriate for both cases, the money laundering and the robberies. But then because the other sentence got reversed and he got resentenced, Judge Patel on remand gave Mr. Luong 20 years on the RICO and then five years on the 924C, which is mandatory consecutive to even the Eastern District. So he ended up getting a 45-year sentence, which I think is also another independent ground that reversed because the sentence, because of this unusual dual nature, ended up being higher than either judge, I think, thought was appropriate. Do you want to save the remainder of your time? Yes, thank you. If it pleases the Court, my name is William Luong. I'm an assistant U.S. attorney in the Eastern District of California, and I was one of the two assistant U.S. attorneys at trial. I'm going to concentrate primarily on the two issues raised by the defendant. I think the very most important thing is this. He concedes the fact that evidence shows that his client was involved in those robberies. He concedes the fact that he received proceeds from that. And he concedes the fact that he was involved in the charged financial transactions. If the Court takes a look at document 663, which is part of the Court record, this is jury instruction number 29. This is critical. Judge Shub instructed the jury as follows as to the elements of the money laundering. The fourth element is what I want to focus on, and I'll read it verbatim. Fourth, that the property was, in fact, derived from the proceeds from the robberies of Xenon or Centon, with all of you agreeing that the proceeds were derived from the robberies of Xenon or Centon or both. The jury positively concluded by their verdict that there was a tie between the proceeds from those two robberies and the charged financial transactions. Now, let's take a look at what's going on. That's the instruction, and there's not a complaint about the instruction. But suppose there was evidence the defendant was swimming in money. I mean, he's got, whether from a legitimate source or not, he's got a half million dollars at his disposal. The fact that a jury comes back with a verdict in response to correct instructions doesn't rule out the possibility there wasn't sufficient evidence to permit a reasonable jury to conclude beyond a reasonable doubt based on the instruction. And I think that's the question being raised here. The connection, the potential connection is easy. He gets money from a robbery, spends money. It may have come from the robbery. But can you say beyond a reasonable doubt if there are other sources of income? Yeah, but when viewed in the most favorable light to the verdict, clearly the government showed the following. The Xenon robbery occurred on April 20, 1995. It resulted in $1.18 million loss to the company. On May 15, 1995, Centon was robbed of about $9.8 million. The spending spree the defendant went on began on April 25, five days after the Xenon robbery. That spree encompassed approximately a quarter million dollars, buying a home, the Scandor property, five luxury automobiles, Mercedes, BMWs, what have you, a boat, and he made a $5,000 payment on his Dorrington house. Testimony from Nan Pham and John Chu, who were two of the six buyers of the stolen computer chips, put the profits to the crime bosses somewhere between $5.5 to $8.5 million, which was shared among the four bosses. The government presented evidence of the defendant's tax returns for six years, beginning 1990 through 1995, the year of the financial transactions. The total amount of income he derived and it was reported to the IRS was $68,000 for the six years. That doesn't provide any income to support this type of spending spree. Now, the defendant was in a tight bind. He couldn't present evidence of other robberies because that would prejudice him. He can't come in and say, I committed 28 other robberies and those could have been his. So none of the evidence really came in. The $120,000 robbery, not robbery, the debt that Jonathan Kay owed, there was scant evidence at all regarding where that came from or why that was or the timing of that. That was just a passage in a ship at night. The defendant didn't argue that. Furthermore, the $30,000 that the defendant obtained through gambling wins at the casino in South Lake Tahoe, I mean, he had to have some money to start with to make $30,000. And he doesn't include in that the losses. The jury rejected that. Furthermore, he provided evidence that there was $21,000 of a loan from his sister-in-law Katrina Vo. Well, the jury's verdict rejected that also because of the bias, the relationship between the witness. It was not corroborated by any other witness. There is no bank records. There is no contract, no canceled checks, nothing to support that. In essence, the defendant and the co-defendant produced no evidence that would give rise to any rational jury to believe that this $250,000 spending spree came from somewhere else other than Centon and Zenon. That's what the jury had in front of it. That's the evidence. And it's still found. It may, counsel suggests maybe it won't make a difference. But the one area where I did have a question is on Count 86 and the $5,000. You basically have this bank account with a bundle of money. He writes a check. It's clear where it's going. He writes it, signs his name. I fail to see where there's the concealment. Let me show you where the concealment is. The defendant, first of all, the Dorrington house belongs to the defendant. He lived there. When the search warrant was executed, he was there at the house. His parents were not there. The master bedroom was occupied by him. There was a portrait of him right above the bed that cost approximately $10,000. There was a receipt for that picture. All indicia in the house came back to the defendant. His children were there. His wife was there. The parents was not there. Because the parents was living at the Scander house. He bought that Scander house with the proceeds for his parents. The reason why the $5,000 matters here is this. The defendant could not walk into a bank and just lay down $15,000 and deposit that because the reporting requirements would require the bank to notify the IRS. So what he did was he took $150, $100 bills, went from Sacramento down to Alhambra, California, which is near Los Angeles, contacted Adam LeWong, a friend, and asked him to go with him to Adam LeWong's bank. There he gave Adam LeWong $90,000 bills, which is $9,000, asked him to buy a cashier's check made payable back to the defendant. That occurred at 1.14 p.m. At 1.20, six minutes later, he gives another $60, $100 bills to Adam LeWong, asked him to buy a second teller's check. Now, each time you buy a teller's check, there's a fee for that. There's no reason why he had to separate the two other than, one, to avoid reporting requirements. Number two, he takes those two checks and flies back to Sacramento that same day and deposits those two cashier's checks into his account, therefore disguising the income where they came from because now it came from Adam LeWong and not money that he put into the bank. So basically he's avoiding the source of the income and he's avoiding reporting requirements. That's the reason why the $5,000 matters here. Does that answer it? Yes. Okay. Now, let's talk about the sentencing here. I think there's really no issue regarding procedural error. What counsel really is talking about is whether or not the court based the sentence on clearly erroneous facts. And he argues that Judge Shub looked at this and considered this a very violent crime. Now, we all know the specified unlawful activity could range from extortion, fraud, which are nonviolent, to the most violent type of killings and robberies. In this particular case, Judge Shub was in the best position to assess the brutality inflicted by these robbery crews. He presided over three trials. Well, I have to say, one comment he made puzzled me, which he says it's something like some of the most vicious crimes the Court has been required to hear. He's been a judge for a long time. And at least these two robberies, you know, I didn't find any evidence of any beatings, so I'm not sure that these robberies really substantiate what he appeared to have in his mind at the time. Well, it's like a temperature. It's relative to the beholder. In this particular case, 12 years after the robbery, the robbery occurred in 1995. This trial occurred in 2007. Twelve years later, the judge witnessed one of the victims from Centon testified shaking, so emotional. That doesn't show up on the record. He testified he was on his knees begging for his life. He testified he lied to the gunman that was behind him, that he expected a bullet to enter his brain in any second. He told the gunman that he had a family, that he had children, and please take pity on me. He begged not to be killed. That's just one aspect of the brutality. If that's not brutal, I don't know what is. That man has been forever violated. And the judge took very, very ---- Were there any beatings? Was there physical harm? Now, I don't discount the psychological and emotional impact. But we get lots of cases where you have that on top of people that are actually left dead or left pleading. And given the reference to beatings, and I haven't found any evidence of beatings here, is it really so clear that he had these crimes and not other crimes in his mind? Well, I think what he had in his mind was this. Like I said, he presented over three trials. The evidence in all three trials was very clear. This was the company. It was an organized crime involving four crime bosses. And the testimony in those trials was heard by the judge, that these four crime bosses shared in the crimes that each one of them committed. Mr. LeWong, although he was uncharged in the Stockton case, there was evidence at trial in that Stockton case that Mr. LeWong was at one of the meetings at the hotel. Well, I mean, is that relevant conduct for these offenses? I mean, the offenses, we're looking at money laundering. Now, I'm from Chicago. We all know Al Capone went down on tax evasion. But there are some limits as to what you can sentence for. And can we say that what happened with regard to Stockton was related conduct for these crimes of conviction? Well, even before Apprendi and Booker, sentencing judges were permitted to consider facts that a jury cannot and can't increase a defendant's sentence on uncharged or even acquitted conduct. That's clear. But it can't be conduct that's entirely unrelated. But it was related because it's part of the crime family. It's part of the organization, the company. Furthermore, in such increases, the Court considered the punishment is for the crime – is not for the crime that he was not convicted, but rather to increase the sentence because of the manner in which the crime was committed. Here, the SUA was robbery. It was not extortion. It was not fraud. And the Court had to account for that and should consider that as part of the 3553 factors in the nature of the circumstances. I've not seen a case this extraordinary where you go from, let's say, the top of the range, which would be 80, and you jump to 480. I mean, that's just extraordinary, particularly in light of you also have this parallel case over in the Northern District. So would you comment on two things? One, what in your view is the relationship sentence-wise between the Northern District and the Eastern District? And second, do you have any cases where this kind of disparity has been upheld as substantively reasonable? Yes, Your Honor. In fact, in reviewing for – in preparation for this oral argument, I went back on and I found a case. It was brought to my attention by one of my colleagues, United States v. Fitch, F-I-T-C-H. That was Court of Appeals number 07-10607. It was filed September 23, 2011, just a few months ago. In that particular case, the defendant was charged with fraud, using access devices, and also money laundering. The SUA in that particular case was the murder of the wife of the defendant. And the court found there that the – although it was uncharged, the court found that there was clear evidence of that. And the – this court, in reviewing the sentence, that was about 500 percent above the sentencing guidelines, which is pretty comparable to what happened here, found it to be reasonable. It was not substantively unreasonable. And in that particular case, the – in the Fitch case, the court does speak of other cases. United States v. Maley, M-A-Y-L-E, that's at 334, Fed 3rd, 552, Sixth Circuit, 2003, upholding a 23-level departure upward for uncharged murders of the defendant's identity theft victims. There's a little difference between a murder and even robbery here, which although there weren't beatings, was extraordinarily, as you pointed out, heinous-type crime. But there's quite a bit of difference between a murder and a robbery. That's correct. And this is so the – I mean, the equivalent here would be as if he had committed a murder. Well, why don't you comment on the Northern District and kind of this – I haven't – this is a very unusual parallelism here. Well, what happened was historically – because I've been with the Department for 22 years now. And I started this case in 1995. So I have a lot of knowledge regarding what's happened. And Judge Shub has been on this case since its inception. I am aware of the Northern District prosecution. The trial in that case went before Judge Patel, I believe, in the year either 2000 or 2001. Sentencing occurred about a year, year and a half later. The defendant, Ruiqi Luang, received a sentence of 25 years. That's 20 years for the RICO and five years for the use of a firearm. Now, keep in mind, in the indictment, nowhere does it mention xenon or xenton. Furthermore, in the transcripts, none of the victims from xenton or xenon ever testified in that case. So Judge Shub is sentencing on xenon and xenton for the very first time. So although I think counsel acknowledged that they weren't part of the predicate acts, they seem to indicate that they were part of the landscape in that. But you're suggesting the transcript wouldn't reveal that. That's correct, because none of the victims ever testified. The first time they testified since the robbery in 1995 was in the Eastern District. That's the first time they were ever called to court. So let's take a look at the totality of the circumstances to determine substantive reasonableness. You have two cases. The RICO would charge a whole bunch of robberies. I mean, we're talking a lot of robberies with firearms. And then you're talking about the Eastern District was money laundering but uses two of the SUAs, the two robberies that occurred in the Central District. The defendant received a total sentence of 45 years. When you add both the Central, I mean, the Northern District and the Eastern District for all those robberies. Now, we know that. Which I note is actually double the sentence affirmed in Fitch. Electronics are remarkable. So I pulled up Fitch and there the sentence was 262 months based on murder that was more closely related to the crimes charged than this other Stockton crime was here. Now, you're suggesting that maybe these two robberies weren't properly under the purview of the Northern District Court. They were under the purview of the Eastern District Court. But it seems peculiar to me. You've got two courts here seeming to compete on sentencing. And the end result is a sentence of 45 years, which is double the sentence for a case that involves murder. Isn't that a lot? No, but the Court has seen a lot of bank robbery cases that end up in the 80-year range when they use the firearms. There are a lot of victims here. There are a lot of victims here. And clearly, because the robberies was an element of the SUAs, it was proved to the jury beyond a reasonable doubt. In the murder case in Fitch, that was a clear and convincing standard. It was uncharged. It was clear and convincing. When you look at the totality of the entire sentence of the Northern District and the Eastern District, the defendant received a sentence of 45 years. Going back to a question that was asked earlier, do you know what the range would have been had he been charged with the robberies? No, but if he had been charged with robbery and the 924c1, we're talking probably somewhere around 28 robberies. You multiply that by 20 years, you're going to be in the thousands. Only two robberies. But the robberies here, there's two robberies here. Correct. But there are other robberies here. I'm asking you if you know what the sentence would have been for these. No, I don't. Thank you. No, I don't. But let me finish my thought on the totality of the entire sentence. So the defendant received a sentence of 45 years from both districts. Well, two of the other crime bosses, John Thad LeWong and Mattie Chan, who were also charged in the RICO with the defendant, Wee Chi LeWong, received sentences of 75 and 80 years. Now, 3553 factors require the court to consider disparity and must consider, and the court did in this particular case, the safety to the public. Public safety is a paramount consideration. This defendant historically has shown that he is a violent individual. He's a leader and organizer of a very violent group. Forty-five years is not totally, submissively unreasonable. The judge, Judge Shub, went through all of the procedural requirements. He considered the sentencing guidelines. He noted that it was advisory. He upward parted from that, I mean, varied upward based on the robberies of Centon and Zenon, which he was permitted to do. And he concluded that a 40-year sentence was appropriate in that case. Judge Patel looked at that sentence afterwards and ran most of her sentence concurrent to Judge Shub, but added the five years for the use of firearm, which she was not. And he concluded that it was a mandatory, right? Mandatory. Mandatory. In the big picture, what concerns me here is that you have two judges who are almost in competition in terms of sentencing, and the result turns out to be whoever wants to sentence more wins, it seems like. And I'm not sure that's how the system is meant to operate. I don't think I look at it in terms of they're in competition. I think that basically, both judges were trying to do what's right to protect the public and to fashion an individualized sentence that would serve the factors under 3553. Well, the two other participants who you named, and I regret I've forgotten their names, who got sentences that were higher, did those sentences come from Judge Patel or where did those sentences come from? Those sentences came from Judge Patel. Well, she was in the position to make the comparison, and she elected to sentence this defendant at a much lower level. Which baffles me to today. I still don't understand that. His involvement, the defendant's involvement was just the same as Johnathan LeWong or Matty Chan. Also, I should let the Court know that Johnathan LeWong was sentenced in the northern and the eastern district for the Stockton homicide. He received a life sentence for 65 years in that case. Thank you. Mr. Malz, do you have some time for rebuttal? Malz, thank you. I do want to make a few points. On the insufficiency of the evidence, this is the whole purpose of a Rule 29 review. The government refers to the jury instruction and the jury's verdict. But this was a very emotional, very bad crimes. There's a lot of evidence where you can see where a jury might disregard the need to show a link from the robberies and the proceeds. And that's what this Court should do. And here, there was $245,000 in the financial transactions, $120,000 that is clear that Mr. LeWong got from someone in Miami, that there's no evidence at all came from the Zenon and Centon robberies. Another $30,000 from gambling. And the prosecutor refers to Mr. LeWong's spending spree starting on April 25th, where there was one Mercedes bought on April 25th, and then a two-month period where nothing else, none of the other financial transactions occurred. And then all the rest of the financial transactions occurred. There's no temporal link between any of those other counts and the Zenon and Centon robberies. And while there was not evidence of specific additional robberies coming into the trial, there was substantial evidence that he was a member of a crime organization, that they were involved in robberies. Michael Winn, his longtime friend, testified that they went to surveil for businesses looking to rob. When he was asked by Mr. LeWong with respect to the crime bosses, were robberies of computer plants one of the crimes you committed, he said yes. There was all kinds of evidence that came out that they were involved in other stuff, just not really specific. There any specific evidence with regard to proceeds from other crimes or the dates when those proceeds were received? The only one that I would say is that he's going to understand why he wouldn't present that evidence. But if it wasn't presented, why can't a jury decide that's all talk? I'm going to look at what I know. Well, I mean, multiple people said he was a crime boss involved in this company and criminal organization. There was $120,000 that Michael Winn testified came sometime after the Centon robbery from a buyer in Miami. He says he didn't know whether it was payment for the Centon robbery or not, and he made a reference of it occurring after the Minnesota, which referred to another. Because they don't have to believe him. Well, this was the government's own witness. This isn't like someone, you know, I called. There's no reason not to believe him. You can believe him. He doesn't know whether it came from this or not. If it came from this, that's a crime. But if that's the standard, if we don't know where the money came from, there's no way you can say beyond a reasonable doubt that a juror, a rational juror could conclude that the money came from either Centon or Zina. On the sentencing issues, I think that the prosecutor's argument that somehow Mr. Luong may have been involved in the Tai Chan home invasion robbery is way outside the record here. There's nothing in the record here at all. There might have been some reference in discovery. I don't have any of that. And it would be totally improper to even make that argument here or to use that kind of evidence against Mr. Luong, where I've had no notice of that at all and there was nothing in the district court record of anything that Mr. Luong was involved in that type of robbery. With respect to the Fitch case, I do – I just want to point out that the Court has already mentioned a couple times that the sentence there was about half of what it was here, 21, 22 years, and it was for murder. There's also a – I'm aware of that case, and there's a petition for rehearing pending. I think the Court has asked the government to file an opposition. I'm not even sure – so there's – it's pending, and that decision is not final. And I think that's basically my time. Thank you. Thank you both for your argument this morning. United States v. Luong is submitted.
judges: McKeown, Clifton, Bybee